[No. 10074.    Department Two.    October 5, 1912.]

THE STATE OF WASHINGTON, *on the Relation of W. V. Tanner, Attorney General, Appellant,* v. NORTHWESTERN INVESTMENT COMPANY *et al., Respondents.*[1]

BUILDING AND LOAN ASSOCIATIONS—FRANCHISE—FORFEITURE—ACTIONS—PREREQUISITES—NOTICE—ORAL PROOF—COMPETENCY.    Where the state auditor orally notified the attorney general that he deemed it unsafe or inexpedient for a building and loan association to continue to transact business, which by Rem. & Bal. Code, § 3620, is a prerequisite to suit by the attorney general, such notice may be proved by any competent witness who was present and heard the communication.

CONTINUANCE—ABSENCE OF EVIDENCE—ABUSE OF DISCRETION.    In an action by the state to dissolve an unlawful building and loan association, tried by the court without a jury, it is an abuse of discretion to refuse a continuance for less than one day to enable the state to obtain competent proof of the prerequisite auditor's notice to the attorney general to prosecute the suit, if, by any misunderstanding, counsel for the state had failed to prove such preliminary fact.

BUILDING AND LOAN ASSOCIATIONS—FRANCHISE—FORFEITURE—ILLEGAL BUSINESS—EVIDENCE—SUFFICIENCY.    A suit is warranted by the attorney general to dissolve a corporation which was doing a building and loan association business without complying with the laws relative to such corporations, and without investing any capital of its own, where it had so extravagantly and wastefully managed its affairs that it had cost the investors $100,000 to invest $50,000 of their own money.

SAME—ILLEGAL BUSINESS — DEFENSES — ESTOPPEL — CONSENT OF STATE OFFICIALS.    Engaging in the business of a building and loan association without complying with the laws governing such corporations is against public policy, and the fact that the state auditor gave his consent thereto on the advice of the attorney general does not estop the state from proceeding against the corporation to prevent a continuance of the business.

SAME—FORFEITURE OF FRANCHISE—ILLEGAL BUSINESS—RIGHTS OF INVESTORS TO ASSETS.    Where a corporation illegally engaging in a building and loan association business has accumulated a fund that

[1]Reported in 126 Pac. 895.

belongs to the investors, and sought to transfer its assets to a legally incorporated company, the investors are entitled to have the fund distributed without further reduction than the necessary cost of administering it; and the newly organized building and loan association should be dissolved, where it appeared to be organized for the sole purpose of taking over and administering the fund.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered September 8, 1911, upon granting a nonsuit, dismissing an action to forfeit corporate franchises. Reversed.

*The Attorney General* and *S. H. Kelleran, Assistant,* for appellant, contended, among other things, that the respondent corporations are amenable to the laws regulating building and loan associations. *Conaway v. Co-Operative Homebuilders,* 65 Wash. 39, 117 Pac. 716; *Land Title & Trust Co. v. Fulmer,* 24 Pa. Sup. Ct. 256. The charters are subject to forfeiture for wilful nonuser, misuser, or usurpation of powers granted. *State ex rel. Hadley v. Delmar Jockey Club,* 200 Mo. 34, 92 S. W. 185, 98 S. W. 539; *Chicago Life Ins. Co. v. Needles,* 113 U. S. 574; *International Fraternal Alliance v. State,* 86 Md. 550, 39 Atl. 512, 40 L. R. A. 187; *State v. Interstate Sav. Inv. Co.,* 64 Ohio St. 283, 60 N. E. 220, 83 Am. St. 754, 52 L. R. A. 530; *Leslie v. Lorillard,* 110 N. Y. 519, 18 N. E. 363, 1 L. R. A. 456; *People v. North River Sugar Ref. Co.,* 121 N. Y. 582, 24 N. E. 834, 18 Am. St. 843, 9 L. R. A. 33; *People ex rel. McIlhany v. Chicago Live Stock Exchange,* 170 Ill. 556, 48 N. E. 1062, 62 Am. St. 404, 39 L. R. A. 373; *People ex rel. Stewart v. Young Men's Father Matthew T. A. B. Soc.,* 41 Mich. 67, 1 N. W. 931; *Hartnett v. Plumbers' Supply Ass'n,* 169 Mass. 229, 47 N. E. 1002, 38 L. R. A. 194; *State ex rel. Attorney General v. Central Ohio Mut. Relief Ass'n,* 29 Ohio St. 399; *State ex rel. Attorney General v. Milwaukee, Lake Shore & W. R. Co.,* 45 Wis. 579; *People ex rel. Attorney General v. Utica Ins. Co.,* 15 Johns. 358, 3 Am. Dec. 1243; *People v. Mercantile Co-operative Bank,* 53 App. Div. 295, 65 N. Y. Supp. 766; *State ex rel. Attorney General v. Seneca County Bank,* 5

Ohio St. 171; 2 Morawetz, Private Corporations, § 1024. A business which is dependent for its existence upon chance or upon lapses and forfeitures enforced against those in contract relations with it, and which must meet inevitable failure if all persons with whom it contracts perform, is against good morals and against public policy, and should be destroyed. *State v. New Orleans Debenture Redemption Co.*, 51 La. Ann. 1827, 26 South. 586; *New Orleans Debenture Redemption Co. v. Louisiana*, 180 U. S. 320; *State ex rel. Prout v. Nebraska Home Co.*, 66 Neb. 349, 92 N. W. 763, 103 Am. St. 706, 60 L. R. A. 448; *State v. Interstate Sav. Inv. Co., supra; Bettle v. Republic Sav. & Loan Ass'n*, 63 N. J. Eq. 578, 53 Atl. 11; *Walker v. United States*, 152 Fed. 111; *Fidelity Funding Co. v. Vaughn*, 18 Okl. 13, 90 Pac. 34, 10 L. R. A. (N. S.) 1123. A building and loan association is said to be insolvent when the assets are insufficient to repay the amounts of money which the shareholders have already paid in. Endlich, Building Associations, § 511. Thompson, Building Associations, § 289; *Bettle v. Republic Sav. & Loan Ass'n, supra; Towle v. American Bldg., Loan & Inv. Soc.*, 61 Fed. 446; *Chapman v. Young*, 65 Ill. App. 131; *Commonwealth ex rel. McCormick v. Pennsylvania Bldg. & Loan Ass'n*, 20 Pa. County Ct. Rep. 589. Or, when its available assets are below the level of stock paid in, and it is unable to pay its shareholders (contract holders) dollar for dollar. *Continental Nat. Bldg. & Loan Ass'n v. Miller*, 44 Fla. 757, 33 South. 404; *Bingham v. Marion Trust Co.*, 27 Ind. App. 240, 61 N. E. 29; *People v. New York Building Loan Banking Co.*, 41 Misc. 363, 84 N. Y. Supp. 844. Or, when it is unable to carry to completion the purposes of its existence. *Gunby v. Armstrong*, 133 Fed. 417. The attempted transfer of the business, assets and liabilities from the Northwestern to the Inland, was beyond the powers of each of said corporations, and void. *Trowbridge v. Hamilton*, 18 Wash. 686, 52 Pac. 328; *Bankers' Union of the World v. Crawford*, 67 Kan. 449, 73 Pac. 79, 100 Am. St. 465; *Whaley v. Bankers' Union of*

*the World,* 39 Tex. Civ. App. 385, 88 S. W. 259. The proceedings for voluntary dissolution of the Northwestern do not prevent maintenance of this proceeding. *People v. Seneca Lake Grape & Wine Co.,* 52 Hun 174. The companies are insolvent within the rule of *State ex rel. Jenkins v. Equitable Indemnity Ass'n,* 18 Wash. 514, 52 Pac. 234. In any event, they are impotent and should be wound up and a receiver appointed under the authority of *Conlan v. Oudin,* 49 Wash. 240, 94 Pac. 1074; *State ex rel. Conlan v. Oudin & Bergman Fire Clay Min. & Mfg. Co.,* 48 Wash. 196, 93 Pac. 219; *Boothe v. Summit Coal Min. Co.,* 55 Wash. 167, 104 Pac. 207.

*R. M. Webster* and *Fred M. Williams,* for respondents, contended, *inter alia,* that the state is estopped to oust respondents. Thompson, Corporations (2d ed.), p. 1035, par. 1974; *People ex rel. Howard v. Schnepp,* 179 Ill. 305, 53 N. E. 632; *People ex rel. Roeser v. Gartland,* 75 Mich. 143, 42 N. W. 687; *Walker v. United States,* 139 Fed. 409; *United States v. Johnston,* 124 U. S. 236, 254; *Chicago, St. Paul, M. & O. R. Co. v. Douglas County,* 134 Wis. 197, 114 N. W. 511, 14 L. R. A. (N. S.) 1074; *Commonwealth v. Heirs of Andre,* 3 Pick. 224; *State ex rel. Sanche v. Webb,* 110 Ala. 214, 20 South. 462; *People ex rel. Gridley v. Farnham,* 35 Ill. 562; *Comanche County v. Lewis,* 133 U. S. 198; *People v. Perrin,* 56 Cal. 345; *Attorney General v. Joy,* 55 Mich. 94, 20 N. W. 806. After the delay of the state in instituting action until the rights of third parties became vested, it cannot now so act as to impair such vested rights. *Oregon Mortgage Co. v. Carstens,* 16 Wash. 165, 47 Pac. 421, 35 L. R. A. 841; *Abrams v. State,* 45 Wash. 327, 88 Pac. 327, 122 Am. St. 914. The transfer of the assets of the Northwestern Investment Company to the Inland Building & Loan Association is valid. *Spare v. Home Mut. Ins. Co.,* 17 Fed. 568; *LaRue v. Groezinger,* 84 Cal. 281, 24 Pac. 42, 18 Am. St. 179; *Empire Pav. & Const. Co. v. Prather's Adm'r,*

58 Mo. App. 487; *Devlin v. Mayor, etc. of New York*, 63 N. Y. 8; *Brown v. Chambers*, 12 Ala. 697; *Cochran v. Strong*, 44 Ga. 636; *Carr v. Waugh*, 28 Ill. 418. The trustees of a corporation seeking voluntary dissolution are the proper authorities to close the business of the corporation. Rem. & Bal. Code, § 3707; Thompson, Corporations, § 2845; Cook, Stock and Stockholders, 641; *Brown v. Schleier*, 112 Fed. 577.

FULLERTON, J.—This is a proceeding, brought in the name of the state by the attorney general, to forfeit the franchises of the respondent corporations. The ground upon which the proceeding is based is, in substance, that they have conducted a building and loan business within the state without complying with the laws relative thereto; that they have misused franchises which they have, and have exercised franchises which they have not; that their business is fraudulent and contrary to law; and that they are insolvent. Issue was joined on the allegations of the complaint, and a trial entered upon, which proceeded until the close of the state's case in chief, when the respondents moved for a nonsuit and for a dismissal, on the ground that the state had failed in its proofs to maintain the allegations of its complaint. This motion the court granted, and the state appeals.

The respondent Northwestern Investment Company had its origin in July, 1909, when it was incorporated under the name of the National Home Building Company. It continued under that name until December 22, 1909, when the name was changed to the National Home Company. It adopted its present name on November 14, 1910. The articles of incorporation under which the company operated were broad and comprehensive. It was empowered to buy, own, sell, encumber, convey, and deal in real estate and personal property; to borrow money and give security for the same; to loan money and take real estate, mortgages, notes,

bonds, and other evidences on commission or otherwise, and to deal generally in commercial paper. The company, however, engaged in but one class of business, namely, a business partaking of the nature of a building and loan association. It issued and sold to its investors a form of contract calling for an initial payment of $6, and monthly payments of $6 each, until eighty of such monthly installments should be paid, when the contract was to "be deemed to be paid up," and the holder entitled to be paid "the total amount paid on the contract," together with the holder's proportional share of the funds "accruing from lapses, fines, transfer fees, simple and compound interest earnings, and any other surplus accretions to the reserve and loan fund of the series to which the contract belonged," as soon as the amount in said fund to the credit "of the contract equaled seven hundred and twenty dollars, which is the maturity value of" the contract; further "subject, however, to the provisions of paragraph 18 on the back" thereof. Paragraph 18 provided that not more than fifty per cent of the accumulations to the reserve and loan fund for any one month should be used for the making of cash settlements or redeeming paid-up certificates. The contract also contained provisions for fines and forfeitures and the nonpayment of installments when due, and for loaning the funds accumulated in the loan and reserve fund to the contract holders. It also provided that:

"Four dollars and seventy-five cents ($4.75) from each and every monthly installment received hereon [meaning the contract] after the third installment, together with the return payments for loans granted, including simple and compound interest, the profits derived from the contributions to the reserve and loan fund from lapses, paid up certificates, and any necessary apportionments made hereunder by the company, including all fines and transfer fees, and all other surplus accretions, shall be placed to the credit of the reserve and loan fund for making loans to, or making settlements with, the holders of contracts in the series to which this contract belongs."

The contract itself does not provide for the disposition of the three monthly installments first paid on the contract, nor the $1.25 retained out of the several monthly payments, but it was elsewhere provided that these sums should form a part of the corporation's expense fund, out of which the expense of administering the fund and its office expenses should be paid. The corporation continued business from the date of the organization until June 22, 1911. Between these dates it issued some four thousand contracts, on which it received $151,162. Of this sum it transferred to its expense fund $94,018.87, and to its reserve and loan fund $57,143.13. It also received on its stock subscription of $100,000 the sum of $2,975, which it transferred to its expense fund. Out of its expense fund it has paid, for organization, furniture and fixtures, commissions, legal expenses, and miscellaneous purposes, the sum of $95,374.98. It has made forty-five loans of $1,000 each, and has but $11,276.77 in its reserve and loan fund. Of the four thousand contracts, all were in default on June 12, 1911, except five hundred and sixty-six. The by-laws of the corporation provided for the forfeiture of the contract and the sums paid thereon for non-payment of the monthly installments as they matured. It seems, however, that it was the policy of the company to allow a defaulted contract holder to reinstate himself at any time by paying the delinquent installments with the accumulated fines and penalties. Few, however, seem to have availed themselves of the opportunity thus offered, and the tendency of the number of nondefaulted contracts was to grow constantly less instead of greater. The Northwestern Investment Company was not incorporated as a building and loan association, nor did it attempt to comply with the laws of the state relating to such corporations. On June 22, 1911, it transferred its business to its co-respondent, Inland Savings & Loan Association, and petitioned the court for leave to dissolve. This petition was pending on the institution of the present proceedings. The Inland Savings & Loan Associa-

tion was incorporated as a building and loan association under the laws of this state. Its organization was not perfected when this proceeding was instituted, and it has done no business further than to receive payments on the going contracts turned over to it by its co-respondent.

The record does not directly advise us as to the grounds upon which the trial court rested its judgment, but it can be gathered from the remarks of the judge, made while passing upon objections to the admission of evidence and on the motion for nonsuit, that it was thought that the state had not shown authority in the attorney general to institute the proceedings, and that on the merits no cause was shown authorizing the relief sought by the state. The respondents insist on these objections in this court, and suggest others in their briefs, some of which we shall notice in their order.

The record, as it comes before us from the trial court, lends color to the first objection stated, but we think the fault causing it to be thus barren lies rather within the trial court itself than with counsel representing the state. The statute relating to building and loan associations provides (Rem. & Bal. Code, § 3620), that if it shall appear to the state auditor, from any examination made by him, that a building and loan association is violating its charter or the law, or that it is conducting business in any unsafe, unauthorized, or dishonest manner, or that if it shall appear to the auditor that it is unsafe or inexpedient for such corporation to continue to transact business, he shall communicate the facts to the attorney general, who shall thereupon be authorized to institute such proceedings against such corporations as the occasion may require. To meet this provision of the statute, the state alleged in its complaint that the state auditor deemed it unsafe and inexpedient for the respondent corporations to continue to transact business, and communicated the facts relating thereto to the attorney general; and on the trial it offered evidence tending to support the allegation. This evidence, the trial court rejected, on the ground that it

was not competent, and refused to continue the hearing of the
case until such time as evidence could be brought to the
place of trial which would meet the objections of the court.
In both of these rulings, we think the trial court erred.    It
appeared that the communication made by the auditor to
the attorney general was made orally, and the state sought
to show the fact by a witness who was present and heard the
communication made.   This the court ruled to be incompe-
tent; ruling further that only the auditor making the com-
munication, or the attorney general to whom it was made,
could testify to the fact.   But the fact in controversy was
whether or not the communication was made, and the nature
of the communication; not whether the same was true.
Hence, any person, otherwise competent to testify, who was
present and heard the communication, is a competent wit-
ness to testify to the fact.   1 Greenleaf, Evidence, § 100;
Jones, Evidence, § 300.

The rule that admits such evidence is akin to the rule per-
mitting proofs of an oral contract.   Obviously any person
who stands by and hears an oral contract made between two
persons can testify, not only as to the making of the con-
tract, but as to its terms.   So here, the question being
whether the state auditor had communicated a certain state
of facts to the attorney general, obviously any person, other-
wise competent to be a witness, can testify, not only to the
fact that such a communication was made, but as to the
nature of the communication.   But were the rule otherwise,
we think the court erred in refusing to postpone the hearing
until competent witnesses could be called.   The case was
being tried without a jury.   The inquiry was one of public
concern, made by one of the state's officers on the authority,
it was alleged, of the state itself.   If, by some misunder-
standing of the facts or law of the case, the attorney in
charge of the proceedings failed to produce competent tes-
timony of a mere preliminary fact, it surely would be an
abuse of discretion on the part of the court to refuse him an

opportunity to correct the mistake when the delay would cause as little inconvenience as it would in this instance— a delay of perhaps sixteen hours at the longest.

The question whether or not the state has made a sufficient showing to authorize the dissolution of these corporations and the winding up of their affairs seems to us also to be free from difficulty. The mere recital of the facts concerning their financial transactions we have hereinbefore made shows the necessity for such a course. All of the vast sum of money paid into these concerns was paid in by persons seeking an investment for small sums saved from their daily earnings. The promoters of the enterprise risked nothing of their own therein, and morally and equitably they stood to the investors as trustees of a trust fund; yet so extravagantly and wastefully has the fund been managed that practically two-thirds of it has been consumed in the care of the remainder. In other words, it has cost the investors in the enterprise practically $100,000 to have invested of their own money for their own use $50,000. Any enterprise or business that shows such results as this should not be permitted to operate with the sanction of the state.

Among the contentions for affirming the judgment, suggested by counsel in their briefs, is the contention that the state is now estopped from inquiring into the legality of the business of these corporations. It appears that, when the original corporation was organized and commenced doing business, the state auditor instituted an inquiry into the legality of such business; that, during the course of the inquiry, the matter was submitted to the attorney general, who gave it as his opinion that the business would be legal if certain conditions which he enumerated were complied with; that the auditor made known these conditions to the officers of the corporation, who forthwith caused the corporation to comply therewith, when consent was given by the auditor for a continuance of the business. These acts, however, do not in our opinion constitute an estoppel against the state. The

business conducted by the corporation, if not in itself fraudulent and illegal, is at least contrary to public policy. Its business is therefore contrary to law, and each separate transaction is a new offense against the law. While the state officers may in certain instances condone past offenses, they cannot grant indulgences authorizing the committal of new ones, and hence have no power to authorize the continuance of any act or business which is in violation of law. And so in the cases cited by counsel themselves. They are all cases where the state has sought to recover for past omissions which had once been condoned. None of them relate to a case where the offenses are continuous.

It is next insisted that the Inland Savings & Loan Association is a valid organization, or can be made such; and since it has taken over the business of the old corporation, the state ought not to be allowed to interfere without showing some default which it has committed, and that no such default has been shown. But the business of the old corporation is inherently vicious, and cannot be made legitimate by merely transferring it to a new corporation. The assets and funds if turned over to the new corporation should not be administered upon according to these so-called contracts. These assets and funds are the property of the persons who enabled the corporation to acquire them, and should be turned back to such persons without further reduction than the necessary costs of administering the fund. As the Inland company has no other business seemingly than to administer the fund, and has not otherwise perfected its organization, there would seem to be but little use for its further existence.

The contention that the contract issued by the original corporation is a valid contract has been sufficiently considered by what has been said on other branches of the case.

The judgment is reversed, and the cause remanded for a new trial.

MOUNT, C. J., MORRIS, and ELLIS, JJ., concur.